UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| TONYA CANADY, | 3:07-cv-01843 (CSH) |
| --- | --- |
| Plaintiff, | **OPINION AND ORDER** |
| v. | **ON DEFENDANT'S MOTION** |
| | **FOR SUMMARY JUDGMENT** |
| MILTON JACKSON, JR., | [Doc. #25] |
| Defendant. | September 29, 2010 |

HAIGHT, Senior District Judge:

Plaintiff Tonya Canady filed this civil rights complaint on December 12, 2007 against Defendant Milton Jackson, Jr., an officer in the New Haven Police Department. Jackson is sued in his individual capacity only. In her Complaint, Canady alleges that in January of 2005, the defendant and several other New Haven police officers "battered down the door to the plaintiff's residence at 27 Pond Lilly Avenue in New Haven" with "no warrant and no probable cause, nor any exigent circumstances permitting them to proceed in this manner. They awakened the plaintiff from her sleep, with their guns drawn. They searched her apartment." Compl. [Doc. #1] ¶ 6. Canady alleges that Jackson acted under color of state law and, by conducting this unlawful entry and search, caused her to suffer property damage and severe emotional distress, all in violation of the Fourth Amendment and 42 U.S.C. §§ 1983 and 1988. *Id.* ¶¶ 7-9.

Now pending before the Court is Jackson's Motion For Summary Judgment. For the reasons that follow, Jackson's motion is GRANTED.

**I.  Facts**

    **A.  Undisputed Facts**

"On February 1, 2006 at approximately 4:42 a.m., a woman called 911 and stated that she

was being held inside of 27 Pond Lily Avenue ('27 Pond Lily Avenue' or the 'residence') at knifepoint." Def.'s Local Rule 56(a)(1) Statement [Doc. #26] ¶ 1.  As to that, there is no dispute, *see* Pl.'s Local Rule 56 Statement [Doc. #28-1] ¶ 1 (admitting the allegation), and the authenticity of the call or the transcript thereof is nowhere contested by Plaintiff.

The 911 call triggered the chain of events that gave rise to this lawsuit, and the disposition of the present motion depends almost entirely on the content of that call.  Because it is central to the present motion, I quote the transcript in full:

> CALLER: NOW THE ... NOW THE POLICE GONNA BE OVER HERE THEN.
>
> 911: NEW HAVEN 911, WHAT'S THE ADDRESS OF YOUR EMERGENCY?
>
> CALLER: HUH?
>
> 911: HELLO?
>
> CALLER: UH, 20.... 27 POND LILY AVENUE
>
> 911: WHAT'S WRONG.
>
> CALLER: UM, I.... I COME OVER HERE, I CAME DOWN HERE FROM, UM, SPRINGFIELD TO GO AND THEY....
>
> [UNINTELLIGIBLE PERSON IN BACKGROUND]
>
> CALLER: **LISTEN, SHE GOT A BUTCHER KNIFE AND SHE GOT THE KEYS AND GOT ME LOCKED IN HERE.**
>
> 911: HOLD ON, DON'T HANG, HOLD ON
>
> CALLER: DO YOU HAVE MY KEYS?
>
> 911: HOLD ON, DON'T HANG UP.

| | | |
|---|---|---|
| CALLER: | | ALRIGHT. |
| 911: | | 27 POND LILY, DO NOT HANG UP.... |
| CALLER: | | YEP. |
| 911: | | DO NOT HANG UP. |

[UNINTELLIGIBLE PERSON IN BACKGROUND]

| | | |
|---|---|---|
| CALLER: | | I CALL ON THE PHONE. |
| 911: | | STAY ON THE PHONE WITH ME. |
| CCS:[1] | | POLICE EMERGENCY. |
| 911: | | HI, SOMEBODY HAS, UH, A BUTCHER KNIFE, GO AHEAD MA'AM, TALK TO THE POLICE. |
| CCS: | | WHERE MA'AM? |
| 911: | | UH, SHE SAID, SHE WAS CALLING FROM 27 POND LILY AVENUE AND SHE'S ON A CELL PHONE, THAT'S ALL I GOT, SAID SOMEBODY WAS HOLDING HER, AGAINST HER WILL WITH A BUTCHER KNIFE AT 27 POND LILY, CALL BUCK NUMBER ON THE CELL IS 668-0039. |
| CCS: | | OKAY. |
| 911: | | ALRIGHT. |

New Haven Dep't of Police, Service Statement Transcription, Def's Mem. Ex. A [Doc. #27-1] at 1-2 (ellipses in original; bold emphasis added).

The parties also agree that Jackson was dispatched to the residence, where he arrived

---

[1] Although the parties do not identify the meaning of "CCS," it appears that this person is the police dispatcher, who would normally continue the conversation with the 911 caller. The most reasonable interpretation of the transcript is that the 911 caller hung up, leaving the 911 operator to relay to the police dispatcher what the caller had said.

approximately five minutes later.

## B. Disputed Facts

What happened next is in dispute.

Officer Jackson contends that when he was dispatched, he "became aware of the history of domestic violence at the residence." Jackson Aff., Def.'s Mem. Ex. C [Doc. #27-1] ¶ 8. In his version of the story, he arrived with several other officers, who all "positioned themselves at various locations around the perimeter of the home." *Id.* ¶ 12. He observed "lights on inside of the home," and at a window, he observed "individuals inside" and could hear "a very loud argument" and "a woman crying inside of the residence." *Id.* ¶¶ 12-13. Jackson avers that he and another officer knocked loudly, identified themselves as police, and asked the people inside to open the door, but "[w]hen the occupants of the residence heard the banging on the doors, they became silent." *Id.* ¶ 15-16. After it became clear "that no one was going to open the door for us," Jackson and the other entered: "I kicked in the front door, identified myself as police and entered the living room of the residence with my gun drawn." *Id.* ¶ 20. Jackson avers that he believed the woman he heard crying inside the house "was the 911 caller and in danger," and that "the fact that no one opened the door despite our repeated requests for them to do so suggested to me that someone was preventing those inside of the home from opening the door." *Id.* ¶ 22. Upon entry, Jackson claims to have encountered Canady, one other adult, and one female child, all "on the first floor. The Plaintiff was crying and very upset when we entered the residence." *Id.* ¶ 25. The individuals denied calling 911, or that anyone was being held inside at knifepoint. *Id.* ¶ 26. The parties agree that Jackson performed a quick visual inspection, or "protective sweep," of the rooms upstairs, which was "completed in less than two to three minutes"; the purpose was "to confirm that no armed individuals

were there who posed a threat." Def.'s Local Rule 56 Statement ¶ 27; *see also* Pl.'s Local Rule 56 Statement (admitting same). Jackson avers that following the sweep, the officers spoke with both women and asked if they had any operational cell phones in the residence. "[T]he Plaintiff stated that she had two phones, and she voluntarily produced both of them. Both phones had the number 668-0039 [the number that had placed the 911 call] in their call history." Def.'s Aff. ¶ 35. "After speaking with the women and finding no obvious signs of violence, no further action was taken." *Id.* ¶ 36.

Plaintiff's deposition tells a different story. According to Canady's deposition, on the night in question, she, her adult friend, and the friend's female child were all asleep in the house. Canady's adult friend was living in Springfield, Massachusetts, at the time, and was visiting "[f]rom out of town." Pl.'s Dep'n. Trans., Def.'s Reply ex. F [Doc. #32-1], at 13-14. When the police entered, Canady was crying; she explains that "[w]ith the guns and stuff I was scared." The police informed her that someone had called 911 "and said they [were] being held hostage with a knife." *Id.* at 26.

> Q. Did [the police officer] tell you that someone called 911 from a cell phone?
>
> A. Yup. Because they said, "Let me see your cell phone." So, I showed them. I said, "Here." He said I called. I'm like, "Why would I play games like that? You don't play like that."

*Id.* Plaintiff's deposition also elaborates upon a history of domestic disturbances at her home address, 27 Pond Lily Avenue. Upon questioning, she confirmed that she recalled five separate police responses to those premises in April, July, August, October, and November of 2004. *Id.* at 33, 40-43, 47, 49-50.

A quite different version of the night in question is found in Canady's response to Jackson's interrogatories.

> On January 31, 2005, I was sleeping in the upstairs bedroom when I heard a loud noise coming from the downstairs entryway. I went downstairs to see where the noise had come from when I saw several police officers inside my apartment, with their guns drawn. I asked the officers why they were inside my apartment, they directed me to raise my arms and to remain quiet while they continued to search my home. I again asked them why they had broken into my home, Officer Jackson stated that they had received a call that there were hostages being held at my address. When the officers concluded their search they realized that they must have had the wrong address. I asked them about the damage to my doors and whether they were going to repair them, Officer Jackson only laughed at my question. The police officers soon left without leaving an incident report, search warrant, or any information that could be used to memorialize their break-in and search of my apartment. The two doors that the officers broke were unable to be closed and locked, because of this my home was exposed to the cold weather and was unable to be secured against any potential criminal threats. . . . I was the only person inside the apartment when the defendant entered the premises. . . . Between January 2004 and the date of the incident the police were never dispatched to 27 Lily Pond [*sic*] Avenue.

Pl.'s Resp. To Def.'s First Set of Interrogs. & Reqs. for Prod'n, Pl.'s Opp'n Ex. [Doc. #28-2], at 2-3, 4-5. It is this version of events upon which Canady principally relies in opposing Jackson's motion for summary judgment, despite two irreconcilable contradictions between those accounts. In the interrogatories, Canady claims she was home alone and that the police were "never dispatched" to her address. But in her deposition testimony, Canady confirmed that two other individuals (the same ones identified in Jackson's account and his police report) were present that evening, and that the police had been dispatched to her home on several occasions. As I explain below, I find that Plaintiff's interrogatories are not significantly probative, but that is neither here nor there, because ultimately the dispute is not material. Even if her interrogatory answers are assumed to be true,

Plaintiff's claims fail as a matter of law.

## II. Legal Standard

### A. Standard for Summary Judgment

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323-25 (1986).

Materiality is determined by "[t]he substantive law governing the case." *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citation omitted). "In assessing the record to determine whether there is a genuine issue to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

However, the party opposing summary judgment "may not rely merely on allegations or denials," Fed. R. Civ. P. 56(e)(2), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, *or is not significantly probative*, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted; emphasis added).

## III. Discussion

### A. Exigent Circumstances

In this case, Jackson's defense is that "his warrantless entry into Plaintiff's home . . . was lawful under the exigent circumstances exception and that his limited search was a permissible protective sweep." Def.'s Mot. [Doc. #25] at 1.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures." U.S. Const. am. IV (emphasis added). But police entry into and search of a home, without a warrant, is only *presumptively* unreasonable, as the Supreme Court recently reiterated in a unanimous opinion:

> [B]ecause the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions. We have held, for example, that law enforcement officers may make a warrantless entry onto private property to fight a fire and investigate its cause, to prevent the imminent destruction of evidence, or to engage in "hot pursuit" of a fleeing suspect. Warrants are generally required to search a person's home or his person unless "the exigencies of the situation" make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.
>
> One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant *or to protect an occupant from imminent injury*.

*Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citations and some internal quotation marks omitted; emphasis added).

The Second Circuit recommends six guideposts when determining the need for quick action:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause ... to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

*United States v. Fields*, 113 F.3d 313, 322-23 (2d Cir. 1997) (quoting *United States v. MacDonald*, 916 F.2d 766, 769-70 (2d Cir. 1990) (en banc)).

Applying the law to this case, there is no dispute as to the content of the 911 call. "[A]n anonymous 911 call reporting an ongoing emergency is entitled to a higher degree of reliability and requires a lesser showing of corroboration than a tip that alleges general criminality." *United States v. Simmons*, 560 F.3d 98, 105 (2d Cir. 2009). Circumstances are even more exigent "where the caller expressed an immediate risk of harm to herself, and where the address from which the call was placed was verified." *Id.* (quoting *Anthony v. City of New York*, 339 F.3d 129, 131 (2d Cir. 2003)).

After the call, this case contains a factual record that is "disputed" by Canady's interrogatory responses. The Court finds that, in light of Plaintiff's own admissions during her deposition and contemporaneous documentary evidence to the contrary, her interrogatory responses are "not significantly probative." *Anderson*, 477 U.S. at 250. Thus, there is no genuine dispute as to the fact that the police were summoned to an address with a history of domestic disturbances, and that three people were present at the residence.

Yet even if the Court were to give credence to Canady's interrogatory responses and accept the fact pattern most favorable to her, summary judgment would still be appropriate. That is because when I resolve all disputed facts and draw all inferences in Canady's favor, the following fact pattern would apply: After receiving the 911 call from an alleged victim, the police arrived at the address

given by that victim as her present location. They found the house dark and silent. They knocked loudly and saw no reaction inside.

Armed with only the information from the 911 call — that a person was being held inside, against her will, at knifepoint — one cannot fault them for knocking loudly and, upon getting no answer, breaking down the door. Otherwise, all knife-wielding hostage-takers would, upon police arrival, kill the lights and silence the hostages until the police went away. That would defeat the entire purpose of the unified 911 emergency number.

Once the police entered the apartment, they came upon the plaintiff, by herself. Even if the plaintiff was alone in the home, and explained as much to the police, the 911 call gave more than enough cause for concern that she might be lying, under duress, in order to make the police go away. It is undisputed that they explained the nature of the 911 emergency call to her and performed only the most basic sweep of the premises, which was concluded in a matter of minutes. In *Tierney v. Davidson*, 133 F.3d 189 (2d Cir. 1998), the Second Circuit said:

> Exigent circumstances do not end merely because the victim indicates that she is no longer in danger. That is a determination for the officer to make independently in light of the totality of the circumstances. Nor did the absence of blood, overturned furniture or other signs of tumult render Davidson's belief that danger existed unreasonable. Davidson was not required to withdraw and go about other business, or stand watch outside the premises listening for the sounds of splintering furniture.

133 F.3d at 198 (internal quotation marks, brackets, and parentheses removed). Applying this law to the facts in the case at bar, and in light of the life-or-death scenario described in the 911 call here, it is clear that the search of the premises was reasonable.

Applying the *MacDonald* factors here, I conclude that (1) the gravity of the alleged offense,

an assault with a weapon and possible kidnapping, was very severe; (2) the kidnapper was alleged to be wielding a deadly weapon, which places the consequences for error at their highest level; and (3) such circumstances would give rise to a clear showing of probable cause. The police arrived at the exact and correct address given by the 911 caller, which could not be otherwise verified because the call was placed from a cell phone; the house was quiet and dark; and the premises were surrounded. Therefore, (4) there was a reasonably strong, but not overwhelming reason to believe that the suspect was in the premises being entered, and (5) there was not a great likelihood that the suspect would escape if not swiftly apprehended, unless the police left without any investigation. However, there has been no dispute that Officer Jackson knocked and announced his presence loudly, and that there was no response. If the door had been answered, (5) a peaceful entry and assessment of the situation would have been possible. In the absence of an answer at the door, it was not possible to investigate the circumstances surrounding the 911 call without using a minimum amount of force to knock down the door. There is no dispute that the officers entered the premises with their firearms drawn, but there is no suggestion that any shots were fired. If the house had indeed been dark and quiet and its sole occupant asleep, there would have been nobody inside to feel threatened by such actions.[2]

Balancing the *MacDonald* factors in this case, it is clear that whichever of Plaintiff's conflicting accounts one accepts, Jackson's entry onto the premises, his temporary stop of Canady, and his cursory search of the premises were all reasonable under the Fourth Amendment, and no

---

[2] On the contrary, if Jackson's version of events is true, and there was indeed loud arguing and crying followed by silence upon the police announcing their arrival, then the display of firearms by the officers was all the more reasonable to protect their own safety and that of the occupants.

reasonable jury could find otherwise. *See also Anthony*, 339 F.3d at 136-37 (holding that, after a similarly troubling 911 call, "the substance of this 911 call [] created exigent circumstances justifying the warrantless entry"). Thus, even if the factual disputes asserted by Canady were "genuine," they would nevertheless be immaterial for summary judgment purposes. Either way, summary judgment is appropriate.

B.     **Qualified Immunity**

In addition or in the alternative, Jackson raises a defense of qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (internal quotation marks and citation omitted). Because qualified immunity is an immunity from suit rather than a mere defense to liability, it is effectively lost if a case is erroneously permitted to go to trial. *Id.*

Public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights. *Anthony*, 339 F.3d at 137-38. The Supreme Court's recent holding in *Pearson* allows me to address the second prong first. *See* 129 S. Ct. at 818. "A police officer's actions are objectively unreasonable, and therefore are not entitled to immunity, when no officer of reasonable competence could have made the same choice in similar circumstances." *Anthony*, 339 F.3d at 138.

For reasons already discussed and stated more fully in Jackson's brief, [Doc. #27] at 11-14, he is clearly entitled to qualified immunity in this case as a matter of law. His entry and search were

not objectively unreasonable in light of the totality of the circumstances.

**IV.     Conclusion**

For the foregoing reasons, Jackson's search of the premises was reasonable under the exigent circumstances described in the 911 call, and therefore did not constitute a violation of Canady's rights under the Fourth Amendment. In the alternative, Jackson is entitled to qualified immunity for this search. Defendant's Motion for Summary Judgment [Doc. #25] is **GRANTED**, the case is **DISMISSED** with prejudice, and the Clerk of Court is instructed to close the file.

It is **SO ORDERED**.


Dated: New Haven, Connecticut
September 29, 2010

                                        */s/ Charles S. Haight, Jr.*
                                        Charles S. Haight, Jr.
                                        Senior United States District Judge